

**SO ORDERED,**

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LOUISE RENEE BLANKENSHIP, | ) | Case No.:   11-13484-JDW |
| | ) | |
| Debtor. | ) | Chapter 7 |

| | | |
|---|---|---|
| INTERSTATE PLYWOOD CO., | ) | |
| LLC, and GEORGE R. WINFIELD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | A.P. No.:   12-01050-JDW |
| | ) | |
| LOUISE RENEE BLANKENSHIP, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This adversary proceeding came before the Court after a three-day

bench trial on the *Complaint for Judgment and to Except from Discharge* (the

"Complaint")(A.P. Dkt. # 1) filed by Interstate Plywood Co., LLC ("IPC") and

George R. Winfield ("Winfield") (together, the "Plaintiffs"), against defendant

Louise Renee Blankenship (the "Debtor"), requesting that certain debts owed to the Plaintiffs by the Debtor be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and/or (6).[1]  A trial on the adversary proceeding was held on June 24 and 25, and October 28, 2014.  Testimony was heard from numerous witnesses, documents were received into evidence, and argument was presented to the Court.

At the conclusion of the Plaintiffs' case, the Debtor made an *ore tenus* motion for judgment as a matter of law as to all counts.  The Plaintiffs conceded that the larceny theory of § 523(a)(4) was inapplicable and confirmed that they were no longer pursuing the larceny claim.  For the reasons stated on the record, the Court denied the motion with regard to the remaining claims under § 523(a)(2)(A) and (a)(4), but granted the motion with regard to the § 523(a)(6) claim.

Following the trial, the parties submitted post-trial briefs (A.P. Dkt. # 91 & 92), and this adversary proceeding was taken under advisement on January 27, 2015.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b), and the United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc

---

[1] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

Pro Tunc Dated August 6, 1984.  This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A), (I) and (J). [2]

For the reasons set forth below, the Court finds and concludes that while the Plaintiffs do hold unsecured claims against the Debtor, all of those claims are dischargeable in the Debtor's bankruptcy case.

## I.      FINDINGS OF FACT[3]

IPC, a limited liability company, is an industrial hardwood distributor, doing business in Shelby County, Tennessee.  Winfield is the managing member of IPC.  61 Cabinet, Inc. ("Cabinet") was a corporation that was also doing business in Shelby County, Tennessee, but is no longer operating.  The Debtor's father, Howard O. Blankenship ("Howard") was the president of Cabinet, and, for a time, the Debtor was the secretary/treasurer.

Cabinet was in the business of constructing and installing cabinets. Cabinet bought bulk lumber from IPC, which Cabinet then used in the fabrication of cabinets. Although Cabinet installed some prefabricated cabinets in commercial projects (specifically, apartment complexes), the

---

[2] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7052.

[3] The Court makes the following findings of fact based upon the testimony and exhibits introduced at the trial.  To the extent any findings of fact are conclusions of law, they are adopted as such, and vice versa.

majority of Cabinet's business involved constructing cabinets in-house and installing them in single-family residential projects.  On July 27, 1998, IPC entered into an Agreement Establishing Open Account with Cabinet, which was individually guaranteed by both Howard and the Debtor.  Cabinet's relationship with IPC began at the time of the open account agreement and lasted until Cabinet ceased operations in 2010.[4]   IPC never sold prefabricated cabinets to Cabinet.

Cabinet would order lumber from IPC via phone, and then IPC would deliver the materials to Cabinet at its shop.  Each order had its own invoice, and invoices were sent to Cabinet once a month, reflecting the previous month's purchases.  The invoices sent from IPC to Cabinet did not identify any specific projects or property at which the cabinets fabricated from that shipment of lumber would be installed.  IPC never filed a materialman's lien against any property on account of Cabinet's nonpayment of amounts due to IPC.

The Debtor has a high school diploma and an associate's degree in computer science, but no further training in accounting, bookkeeping, or business.  She credibly testified that she was not familiar with Generally Accepted Accounting Principles, and was unfamiliar with standard

---

[4] IPC also continued a business relationship for a time with 61 Kitchens and Baths, a company started by Chris Blankenship (the Debtor's brother and Howard's son) after Cabinet closed and filed bankruptcy.

4

bookkeeping practices.   The Debtor handled the day-to-day bookkeeping operations of Cabinet.   The Debtor did not take orders for cabinets from customers, and she did not order supplies or raw materials for the business (from IPC or otherwise). She had additional help with Cabinet's books from time to time, but the bookkeeping responsibilities always reverted to her when other employees quit and when Cabinet became unable to afford to hire someone else.  The Debtor was generally absent from the office during part of 2006 and all of 2007 while she was receiving cancer treatment, though she still worked from home on a limited basis.  The Debtor worked under the complete supervision of Howard.  Although she was the corporate secretary and treasurer, the Debtor did not exercise independent judgment or have autonomy over any but the most basic of bookkeeping functions.   When Cabinet did not have enough money to pay all of its bills, Howard told the Debtor which bills to pay and which to defer.

From 1998-2006, Cabinet usually paid IPC's invoices with commercial checks drawn on Cabinet's bank account.  Cabinet's orders gained volume over time, and IPC eventually became Cabinet's primary wood supplier.  In 2006 or 2007, when Cabinet first began experience financial difficulty brought about by the condition of the housing market, Cabinet began occasionally paying IPC with endorsed third-party checks from builders ("builder checks").  The frequency of payment by builder checks increased

over time.  Later, after a few bounced checks, IPC would not accept checks drawn on Cabinet's corporate account, requiring payment from Cabinet in cash, certified funds or builder checks.

Winfield testified that he became concerned about Cabinet's payment issues in 2008, which is when he first became aware of exactly how far Cabinet was behind.  In an attempt to remedy the situation, Winfield went to talk with Howard to arrange for payment.  Winfield testified that he met with Howard on a near-weekly basis regarding Cabinet's debt to IPC.[5]  The Debtor was not a part of these meetings.  In one of these meetings, Howard and Winfield agreed to create two different receivable balances:  one, a long-term note receivable to cover the arrearage, and a second, regular open account for new deliveries (although they also agreed that IPC would deliver materials to Cabinet on a cash-on-delivery basis only).  IPC transferred the outstanding balance to the long-term note receivable, and opened the new account with the agreement that it would be kept current and a 10% surcharge would be applied to all new purchases to reduce the note on the long-term note.  The cash-on-deliver ("COD") requirement was intended to keep future purchases in check so there would be no additional accumulated balance.

---

[5] In 2007 and 2008, Howard told Winfield multiple times that Cabinet was not making any money, but Winfield did not believe him due to the volume of work he saw Cabinet undertaking.

Initially, Cabinet did pay in advance for purchases from IPC, along with the 10% surcharge, but, eventually, Cabinet began paying less of a surcharge, and eventually quit paying altogether. The volume that Cabinet ordered from IPC also dwindled over time. In December 2009, after Cabinet's failure to pay IPC as agreed, IPC assigned its interest in all debts owed by the Cabinet to IPC prior to September 8, 2009, to Winfield. As further security for payment of the indebtedness due to Winfield, Howard collaterally assigned a life insurance policy on his own life to Winfield. The Debtor was not aware of the life insurance policy or the agreements between Howard and Winfield until after the deals had been struck. The Debtor never agreed to pay the premiums on the life insurance policy, and never agreed to guarantee Cabinet's payment of those premiums. Howard did agree to pay the life insurance premiums, but did not because he could not afford them. In order to maintain the policy, Winfield continued to pay the premiums.

IPC was not the only creditor that Cabinet was having trouble paying. Cabinet began paying IPC and other creditors in cash and builder checks. Cabinet also bounced checks to IPC and to other vendors. As Cabinet's business bank accounts were often overdrawn, Howard directed the Debtor to run builder checks through her personal account so that the bank did not retain the funds to satisfy the overdrafts. In addition to running checks through her personal account, the Debtor would also cash corporate and

7

builder checks for Cabinet at Toarmina Grocery and Market ("Toarmina") in Memphis.  Michael Toarmina, one of Toarmina's owners, testified that he had cashed checks for Cabinet for years – both checks drawn on Cabinet's own accounts and builder checks.   Cabinet bounced checks to Toarmina occasionally, but, over time, the frequency of such bounced checks increased to the point that Toarmina would no longer cash checks drawn on Cabinet's accounts, only builder checks.

Although the Debtor could not provide an accounting of every dime she received through cashing the checks or running the builder checks through her account, the evidence and testimony overwhelmingly supports her contention that the vast majority, if not all, of the funds she received went directly back into Cabinet to pay ongoing expenses and trade creditors, including IPC.  In addition, the Debtor and her mother both took out personal loans secured by their personal assets, the proceeds of which they put back into Cabinet in an attempt to keep Cabinet afloat.

The Plaintiffs presented the expert testimony of John W. Thomas, Jr., a certified public accountant, who reviewed both Cabinet's records and the Debtor's personal records.  Mr. Thomas went through tax returns, reports, bank records, and other financial documents in detail.  He pointed out inconsistencies in Cabinet's taxes and unexplained discrepancies within the records.  However, there was no evidence presented that either the Debtor

was the source of inaccurate information, or that the Plaintiffs relied on the tax returns or other financial documents in making their credit decisions with regard to Cabinet.  In fact, Mr. Winfield testified that he never reviewed any of Cabinet's financial records, and that even if he had reviewed them and uncovered what poor shape the company was in, he still would have continued to work with Cabinet and extend credit to them.  In fact, even after Cabinet failed to pay IPC for tens of thousands of dollars' worth of materials, IPC continued to extend additional credit (ignoring the COD arrangement).

Mr. Thomas's biggest concern, however, was the discrepancies in the cash reports. He testified that found instances of unexplained cash deposited into Cabinet accounts and into the Debtor's personal account, which led him to the conclusion that some sort of "cash hoard" must exist.  It is clear to the Court that if such a cash hoard did exist, the Debtor did not maintain it, have access to it, or even know of it.   Further, based on the testimony and documentary evidence presented at trial, the Court finds that there is no such cash hoard.   The Court finds that the personal funds provided by the Debtor and her mother account for most, if not all, of these "unexplained" cash deposited into Cabinet's accounts.  The Court also believes the Debtor's explanation that cash derived from the Blankenships' personal funds as well as from cashing builder checks (along with builder checks) was used not for

the Debtor's personal expenses, but to pay Cabinet's employees, regular expenses, and trade creditors.

The Plaintiffs also take issue with unexplained cash deposited into the Debtor's personal account, alleging that that the Debtor took money from Cabinet to which she was not entitled.  Mr. Thomas testified that the amount of cash deposited in the Debtor's personal account exceeded her income from Cabinet.  The Debtor credibly testified, however, that she received income from other sources: gifts from her grandfather (who was helping to support her and her son), cleaning houses for other people, dogsitting, and bake sales. In addition, the Debtor deposited cash and checks from Cabinet into her personal account from time to time that she did keep, but she credibly explained that this money was reimbursement for Cabinet bills she paid out of her own account.  Contemporaneous notations on the Debtor's deposit slips bolster her credible testimony on this point.  It would be much more unbelievable if the Debtor had meticulous "records" of the source of all of these funds, years later.  Furthermore, it would be ludicrous of the Debtor to personally borrow money to put into Cabinet, pledging her personal assets as collateral for that loan, and then taking the money right back out of the company.  The Debtor was under no obligation to contribute funds to Cabinet. If she had needed or wanted money for herself, she was well within her rights

to simply keep the funds she received from the bank instead of putting them into the business.

In addition to its inability to pay trade creditors, Cabinet also failed to pay withheld taxes to the IRS.  As a result, because she was an officer of Cabinet, the Debtor remains liable to the IRS as a responsible person for a portion of those taxes.  Plaintiffs also introduced Cabinet's tax returns into evidence, and while the Court agrees from the evidence presented that those tax returns may not be completely accurate, it was conclusively established that the Debtor did not prepare, review, or sign those returns on behalf of Cabinet.  In addition, neither IPC nor Winfield ever reviewed or relied on those tax returns in making credit decisions regarding Cabinet, and the IRS has not complained about the Debtor's actions or inactions to this Court.

The Plaintiffs complain about Cabinet's lack of records, but the Court finds that the Debtor produced all the records requested by the Plaintiffs, both personal and corporate, that were in existence and available.  The unrebutted, credible testimony of the Defendants' witnesses convinces the Court that any additional records that Cabinet may have kept were the victim of computer crash, flood or fire over the last several years.

Finally, the Court notes a pattern in the dealings between the Plaintiffs and Cabinet.  Cabinet paid IPC in full and on time for years.  The economy and Cabinet's business declined, and Cabinet could no longer pay IPC in full

and on time.  Cabinet continued to pay what it could.  Howard instructed the

Debtor to do what she could to get IPC and other vendors paid – including

running builder checks through her personal account and cashing builder

checks at Toarmina.  The Debtor and her parents even took out personal

loans, pledging their personal assets as collateral, and infusing the business

with over $300,000 of those funds to try to keep it afloat.   The Debtor

individually took out a $30,000 personal loan, pledging her personal assets as

collateral, and put that money into Cabinet.   Eventually, however, neither

Cabinet nor the Debtor had assets left with which to continue Cabinet's

operations, and in 2010, Cabinet closed its doors and filed corporate

bankruptcy.  At the time it ceased operations, in addition to the money owed

to trade creditors, Cabinet owed the Debtor back wages.

IPC filed a lawsuit against Cabinet, Howard, and the Debtor in state

court for amounts owed to it under the open account agreement and

guaranty, but obtained a default judgment solely against Cabinet in the

amount of $92,900.26, plus court costs, on July 23, 2010, for the indebtedness

incurred after September 8, 2009.[6]   On August 16, 2011, Winfield also

obtained a judgment against Cabinet, in the amount of $1,178,818.02, plus

court costs, for the pre-September 8, 2009 indebtedness assigned to him by

---

[6] It is not clear from the record why the IPC did not obtain this judgment against the
Guarantors as well.

IPC and the life insurance premiums.[7]  Both judgments are now final and nonappealable, and neither judgment has been paid.   In this adversary proceeding, the Court previously held that IPC and Winfield hold general unsecured claims in the Debtor's bankruptcy case equal to the amounts awarded to them in those state court judgments (by virtue of her guaranty of those debts) (A.P. Dkt. # 39).   In this case, the Plaintiffs seek to have the Court hold these amounts to be nondischargeable under various subsections of § 523 of the Bankruptcy Code.

## II.     <u>CONCLUSIONS OF LAW</u>

In order for the Court to conclude that any debt owed to the Plaintiffs by the Debtor is nondischargeable, the Plaintiffs must first show that they hold a valid claim against the Debtor.  If successful, the Plaintiffs must then demonstrate how and why that claim is nondischargeable under the Bankruptcy Code.  As explained by the United States Supreme Court, "[t]he validity of a creditor's claim is determined by rules of state law.  Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner*, 498 U.S. 279, 283-84 (1991)(internal citations omitted).

---

[7] The Chancery Court suit was stayed as to the Guarantors by this time due to their respective bankruptcy filings.

## A.   The Plaintiff Holds Valid State Law Claims Against the Debtor.

The Plaintiffs previously filed a *Motion for Summary Judgment* (the "MSJ") (A.P. Dkt. # 33) in this adversary proceeding.  This Court granted the MSJ in part and denied it in part.   (the "MSJ Order") (A.P. Dkt. # 39).  Specifically, the Court granted the MSJ as to the principal amount of indebtedness due to the Plaintiffs on the open account claims, the amounts owing on the open account having been guaranteed by the Debtor.  The Plaintiffs were also given leave to present proof of their entitlement to pre-petition and post-petition interest at trial on the open account.  The MSJ was denied as to dischargeability of the claims, and as to liability for unpaid premiums on a life insurance policy on Howard Blankenship.[8]  (*Id.*).

This is a no-asset chapter 7 case, meaning that there are no assets available for distribution to creditors.  Whether the Plaintiffs' claims should be increased to include interest would, at first blush, seem to be an academic exercise as there are no estate funds to pay the Plaintiffs either way.  However, if the Court were to declare the debt nondischargeable, the accrued and accruing interest could be nondischargeable as well.  *See Cohen v. de la Cruz*, 523 U.S. 213 (1998); *Gober v. Terra Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996).  At trial, the Plaintiffs did not put on any evidence of

---

[8] Howard also filed a bankruptcy petition in this Court (Bankruptcy Case No. 12-10107), and was the subject of a separate adversary proceeding filed by the Plaintiffs (A.P. No. 12-1051).  After a somewhat complicated history, that adversary proceeding culminated in the entry of a default judgment against Howard in favor of the Plaintiffs.

14

interest owing for any time period, whether pre- or post-petition. Accordingly, no interest will be added to the Plaintiffs' claims.

With regard to the post-judgment insurance premiums sought by Winfield, the Debtor has no liability for those unpaid premiums. After Cabinet defaulted on its debt to the Plaintiffs, Howard and Winfield entered into an agreement whereby Howard procured a new life insurance policy and assigned the death benefit to Winfield as collateral for the debt. The Debtor was not the insured, was never a beneficiary, and had no knowledge of this agreement or even the insurance policy until much later. The Debtor did not agree to guarantee payment of the premiums for this policy.

Accordingly, the Plaintiff's claims against the Debtor are limited to the amounts set forth in the MSJ Order, specifically $92,900.26 to IPC and $1,178,818.02 to Winfield. (A.P. Dkt. # 39).

## B. The Plaintiff's Claims are Dischargeable.

Having concluded that the Debtor is liable to the Plaintiffs in the amounts set forth above, the Court turns to the question of the dischargeability of those debts. Section 523 of the Bankruptcy Code outlines certain exceptions to discharge in bankruptcy proceedings. Exceptions to discharge are to be construed strictly against the objecting creditor in order to give effect to the fresh start policy of the Bankruptcy Code. *See Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)(*citing*

*Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. 1982)).

In this adversary proceeding, the Plaintiff's remaining claims fall under § 523(a)(2)(A) and (a)(4).   The Plaintiffs bear the burden of proving the elements of nondischargeability by a preponderance of the evidence.   *Grogan*, 498 U.S. at 291.   As discussed below, the Plaintiffs have failed to meet their burden in this adversary proceeding.

### 1.    11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit will not be discharged to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a). The Fifth Circuit has distinguished between "actual fraud" and "false pretenses and representations," so there are two distinct paths to a determination of nondischargeability under that subsection. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991).  A promise to perform acts in the future that is subsequently breached is not, by itself, a fraudulent representation that can give rise to a conclusion of nondischargeability under either path of § 523(a)(2)(A). *Id.* at 692.

### (a)    *False Representation or False Pretense*

In order for a debtor's representation to be a "false representation or

16

false pretense," it must have been "(1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party." *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995)(citations omitted); *see also Field v. Mans*, 516 U.S. 59, 73-75 (1995) (holding that section 523(a)(2)(A) requires subjectively justifiable, but not objectively reasonable, reliance).

Here, there was no knowing and fraudulent falsehood describing past or current facts. The Debtor guaranteed repayment of Cabinet's open account. Those guaranty agreements were signed in 1992 and 1998. Based on the credible testimony of the Debtor and the other evidence, this Court finds that she had every intention of making good on her guaranty if it ever came to that. *See Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992)("A debtor's misrepresentations of his intentions . . . may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised"). The Plaintiffs have failed to prove that the Debtor never intended to honor her obligations at the time of signing the guaranties in the 90's, or at the time the lumber at issue was delivered. The Debtor had a reasonable belief that the invoices would be paid, just as the bills had always eventually been paid in the past, despite the poor performance of Cabinet. At times, the Debtor's own paychecks went uncashed so that vendors such as the

Plaintiffs could be paid.  The Debtor also obtained a personal loan and put the money back into the company to pay company bills.  While the Court may question the wisdom of these actions, those actions are not indicative of fraud with regard to the Plaintiffs.  In fact, the opposite is true.  The Debtor made every effort to see that the Plaintiffs were paid, sometimes from the Debtor's own funds.

On a related note, the Plaintiffs went to great lengths with an expert witness to show that Cabinet's tax returns and other accounting documents were often incorrect or inconsistent.  While the Court agrees that Cabinet's accounting left much to be desired, this is of no moment with regard to the reliance element.  The Plaintiff's expert testified that the Plaintiffs first obtained these documents during discovery in this adversary proceeding, and hence, cannot show that they relied upon the documents in making credit decisions.

### (b)   Actual Fraud

In order for the Court to conclude that a debt is nondischargeable on the basis of "actual fraud," the objecting creditor must prove that

> (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations.

*RecoverEdge*, 44 F.3d at 1293 (citations omitted).

Again, the elements of actual fraud are not satisfied here. For the reasons set forth above, the Debtor did not knowingly make any false representations with the intention or purpose to deceive the Plaintiffs. The Debtor intended to honor her guaranty at the time she signed the documents, and at the time the lumber was delivered.

### 2.     11 U.S.C. § 523(a)(4)

The Plaintiffs also allege that the debts owed to the Plaintiffs are nondischargeable pursuant to § 523(a)(4). Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The phrase "debt for" means "debt arising from" or "debt on account of." *Cohen v. de la Cruz,* 523 U.S. 213, 220 (1998). Accordingly, there are three separate types of debts rendered nondischargeable under § 523(a)(4): (i) debts resulting from fraud or defalcation while acting in a fiduciary capacity; (ii) debts resulting from embezzlement; and (iii) debts resulting from larceny. 11 U.S.C. § 523(a)(4).

### (a)     *Fraud or Defalcation While Acting in a Fiduciary Capacity*

Determining whether a debtor committed fraud or defalcation while acting in a fiduciary capacity is a two-step process. *In re Beveridge*, 416 B.R. 552, 570 (Bankr. N.D. Tex. 2009) (citing *Miller v. J.D. Abrams, Inc. (In re*

*Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)).  First, it must be shown that the requisite fiduciary relationship existed prior to the particular transaction from which the debt arose.  *See, e.g., Cross,* 666 F.2d at 879; *Wright v. Menendez (In re Menendez),* 107 B.R. 789, 793 (Bankr. S.D. Fla. 1989); *Fletcher v. Valdes (In re Valdes),* 98 B.R. 78, 80 (Bankr. M.D. Fla. 1989).  Second, some type of fraud or defalcation must have occurred during the fiduciary relationship.  *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992).

In the context of § 523, the existence of a fiduciary relationship is a question of federal law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).  The definition of "fiduciary" for purposes of section 523(a)(4) is narrower than under common law, as it is "limited to instances involving express or technical trusts.  The trustee's duties must . . . arise independent of any contractual obligation."  *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Circ. 2012)(citations omitted).  Such a trust must exist prior to the alleged wrongful acts and without reference to those acts.  *Rain Bird Corp. v. Salisbury (In re Salisbury)* 331 B.R. 682, 692 (Bankr. N.D. Miss. 2005)(citing *Davis v. Aetna Accept. Co.*, 293 U.S. 328, 333 (1934)).  Constructive or *ex maleficio* trusts – those created to combat unjust enrichment – are excluded from the scope of §523(a)(4).  *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998).  "It is

not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio.  He must have been a trustee before the wrong and without reference thereto." *Davis,* 293 U.S. at 333.  Accordingly, this Court must determine whether or not an express or technical trust, of the kind contemplated by §523(a)(4), existed between the parties so as to place the Plaintiff in a fiduciary capacity to the Defendant.

The Plaintiffs have not alleged any fiduciary duty owed to them by the Debtor that was pre-existing or independent of the transactions giving rise to the debts complained about herein.  Courts have found nondischargeable "debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles" (e.g., bank officers, executors, guardians, receivers), and where the debtor was an officer of the creditor and did not deny that he was a fiduciary.  *Shcolnik*, 670 F.3d at 628.  At one point, the Plaintiffs contended that they are successors-in-interest to the insolvent corporation, Cabinet.  Black's Law Dictionary defines the term "successor-in-interest" as "[o]ne who follows another in ownership or control of property."  *Black's Law Dictionary* 1446 (7th Ed. 1999); *See also, Jones v. Parker*, 1993 WL 453756, *2 (Tenn. App. 1993).  Cabinet is defunct corporation, and the Plaintiffs have not alleged that they own or control it or any successor entity.  The Plaintiffs are merely creditors of Cabinet and by

21

virtue of the Debtor's guaranty of Cabinet's open account, creditors of the Debtor. The Plaintiffs are not the successor-in-interest to Cabinet, and no fiduciary capacity exists under this theory.

That said, "[s]tate law may also create a fiduciary relationship whose breach leads to nondischargeability." *Shcolnick,* 670 F.3d at 628. The Plaintiffs allege that the Debtor, through exercising control over Cabinet, misappropriated funds held in trust by Cabinet for the benefit of the Plaintiffs under the obligations imposed on a contractor by Tennessee's Prompt Pay Act of 1991. TENN. CODE. ANN. § 66-34-101, *et. seq.* Section 66-34-201 provides that "[p]erformance by a contractor in accordance with the provisions of a written contract with an owner for improvement to real property shall entitle such contractor to payment from the owner." Section 66-34-304 of the Tennessee Code further provides that

> Any sums received by the contractor as payment for work, services, equipment and materials supplied by the subcontractor, materialman or furnisher for improvements to real property shall be held by the contractor in trust for the benefit and use of such subcontractor, materialman or furnisher and shall be subject to all legal and equitable remedies.

TENN. CODE ANN. § 66-34-304.

However, § 66-34-702 provides that

> The provisions of this chapter [chapter 34 – the Prompt Payment Act of 1991] shall not apply to contracts for the construction of, or

> home improvement to, any land or building, or that portion
> thereof which is used or designed to be used as a residence or
> dwelling place for one (1), two (2), three (3) or four (4) single
> family units.

TENN. CODE ANN. § 66-34-702.  Accordingly, in order for this statute to apply

to the transactions between Cabinet and IPC, as a threshold matter, the

materials supplied by IPC must have been used in commercial or multi-

family residential projects.  The only evidence presented at trial was the

unrebutted testimony of the Debtor and Howard that Cabinet's business

overwhelmingly consisted of single-family residential projects.  Further, the

few commercial projects undertaken by Cabinet were for apartment

complexes, in which Cabinet installed prefabricated cabinets and not cabinets

constructed from materials supplied by IPC.  The Plaintiffs did not provide

any documents or testimony evidencing that IPC-furnished materials were

ever used in a commercial project, much less the address or location of any

such project or the amount of the debt to IPC arising solely from such project.

The evidence presented at trial established that IPC sold lumber in bulk to

Cabinet for use in multiple, unidentified, single-family residential projects.

Neither IPC nor Cabinet identified the property to which any shipment of

lumber related.   Accordingly, the relationship between Cabinet and IPC was

not one covered by the provisions of the Tennesee Prompt Pay Act.

Therefore, no fiduciary relationship existed between IPC and Cabinet.

Because the existence of any fiduciary relationship between the Debtor and IPC is predicated on the existence of a fiduciary relationship between Cabinet and IPC (and Winfield's status is likewise dependent on IPC's), there is no fiduciary relationship between the Debtor and either of the Plaintiffs that could give rise to nondischargeability under § 523(a)(4).[9]

Even if the Tennessee Prompt Pay Act did create a fiduciary relationship that falls within the narrow confines of § 523(a)(4), this Debtor committed no fraud or defalcation as to the Plaintiffs while acting in that fiduciary capacity.   The term "fraud" means intentional deceit, or positive fraud in fact "involving moral turpitude or intentional wrong" rather than any implied or constructive fraud.   *Hardie v. Swafford Bros. Dry Goods Co.* 165 F. 588, 592 (5th Cir. 1908)(citation omitted).   The United States Supreme Court has recently addressed the bankruptcy-related definition of "defalcation," holding that defalcation may include both intentional wrongs and wrongdoing that is the result of an actor's conscious disregard (or willful blindness) of a "substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty."   *Bullock v. BankChampaign, N.A.*, --- U.S. ---; 133 S.Ct. 1754, 1759 (2013).   The Court in *Bullock* further held that the risk

---

[9] Even if the Plaintiffs could establish a fiduciary relationship between themselves and Cabinet, they would still have to establish that a fiduciary relationship existed between them and the Debtor, individually, which would be difficult.   "[A]n officer's unfaithfulness to or mismanagement of his corporation will not give rise to nondischargeable liability directly to individual creditors of the corporation."   *Cross,* 666 F.2d at 880.

"must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* at 1760 (citation omitted; emphasis in original).

In this adversary proceeding, the Plaintiffs have not proven that the Debtor committed any fraud or defalcation, towards either the Plaintiffs or Cabinet. Cabinet, through the Debtor, paid its obligations to IPC current for many years, before Cabinet's business declined and it experienced financial difficulties. The Debtor even took out personal loans, secured by her own property, and used the proceeds to pay trade creditors and other bills of Cabinet in an ultimately futile attempt to keep the doors open. IPC continued to be paid after the Debtor ceased cashing her own paycheck, although she kept working for Cabinet. The Debtor's bookkeeping was unsophisticated, and, in many cases, poor. That said, the evidence overwhelmingly supports the Court's conclusion that the reason the Debtor employed poor business practices (such as cashing builder checks at Toarmina, running builder checks through her personal account, and using cash) was not to try to defraud Cabinet or its creditors, but rather to try to pay Cabinet's creditors and keep Cabinet operating. Furthermore, although Cabinet, Howard, and the Debtor may have committed some bad acts with

relation to their operation of Cabinet, such as those giving rise to the Debtor's

personal liability to the IRS, none of those bad acts harmed the Plaintiffs.

*(c)*    ***Embezzlement***

The Plaintiffs allege that the debts owed to them by the Debtor are

nondischargeable because the debts were incurred by the Debtor's

embezzlement.  The Plaintiffs contend that the Debtor "took possession of the

Creditor's property (lumber), which was entrusted to Debtor on the condition

of payment." (A.P. Doc. 30).  This characterization appears to be simply the

description of any trade debt.  The evidence was clear IPC did not "entrust"

the materials to the Debtor on the condition of payment; IPC sold Cabinet

materials on an open-account basis.  Further, IPC sold the materials to

Cabinet, and not to the Debtor, so the Debtor individually never took

possession of IPC's property.

The United States Supreme Court has held that "[e]mbezzlement is the

fraudulent appropriation of property by a person to whom such property has

been intrusted, or into whose hands it has lawfully come." *Moore v. United

States*, 160 U.S. 268, 269 (1895).  Further, "[t]here must be proof of the

debtor's fraudulent intent in taking the property." *Miller*, 156 F.3d at 602-03.

The court in *Miller* cited to a Sixth Circuit case, which set forth the following

elements of embezzlement, which a creditor must prove by a preponderance

of the evidence:  (1) creditor entrusted his property to the debtor; (2) debtor

26

appropriated the property for a use other than that for which it was entrusted; and (3) circumstances indicate fraud. *Id.* (citing *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1176 (6th Cir. 1996)). In this case, the Plaintiffs have not proven any of these elements. IPC sold lumber and materials to Cabinet (and not to the Debtor individually). There is no allegation in the record that IPC retained title to the lumber and materials after it was transferred to Cabinet, nor is there any evidence that Cabinet or the Debtor were required to use the lumber for any particular purpose or project. In fact, the testimony was clear that the parties did not separately designate IPC materials on a per-project basis. No evidence has been presented that the lumber and materials were used for any unintended purpose. Instead, the materials were used to make cabinets, exactly as Cabinet had done for years. The Plaintiffs have proven only that materials were supplied to Cabinet, the payment for which was guaranteed by the Debtor, and that no payment was received. Simple nonpayment is not evidence of fraud or embezzlement, but rather a simple breach of contract.

### (d)   *Larceny*

The Plaintiffs conceded at trial that larceny was inapplicable to this adversary proceeding.

### III.   CONCLUSION

Exceptions to discharge are "strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Hudson*, 107 F.3d at 356.   While the Plaintiffs in this adversary proceeding hold valid state law claims against the Debtor arising from her guaranty of Cabinet's open account, the facts and circumstances of this case do not warrant a declaration that those claims are nondischargeable.   A separate final judgment will be entered in accordance herewith.

##END OF ORDER##